# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 23-298

STATE OF LOUISIANA

VERSUS

JERMARCUS LEON MCLENDON

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 16-K-4963-C
HONORABLE HERMAN C. CLAUSE, DISTRICT JUDGE

**********

### SHANNON J. GREMILLION
### JUDGE

**********

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Guy E. Bradberry, Judges.

**CONVICTIONS AND SENTENCES AFFIRMED;
REMANDED WITH INSTRUCTIONS.**

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**P. O. Box 1481**
**Monroe, LA 71210**
**(318) 855-6038**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Jermarcus Leon Mclendon**

**Chad Patrick Pitre**
**Twenty-Seventh Judicial District Attorney**
**Alisa Ardoin Gothreaux**
**Assistant District Attorney**
**P.O. Box 1968**
**Opelousas, LA 70571**
**(337) 948-3041**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GREMILLION, Judge.**

Defendant, Jemarcus Leon McLendon, was convicted of the first degree murders (violations of La.R.S. 14:30) of Nakia Ramer, Jr., and Shawn Parish. He was sentenced to two consecutive life sentences. He appeals his convictions and the consecutive imposition of the sentences. For the reasons that follow, we affirm the convictions and sentences. We remand the matter to the trial court, though, and order the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice.

## FACTS

At 4:39 a.m. on Saturday, September 24, 2016, Mr. Wayne Soileau called the St. Landry Parish Communications District, which handles 9-1-1 calls, informing them that a car was located in the ditch of Cosay Road in which two men appeared to have been shot. Mr. Soileau had stopped his car when he noticed the vehicle in the ditch with its headlights on. When he realized the two occupants of the car were deceased, Mr. Soileau panicked and left the scene. He drove to his home, which is about two miles from the scene, then turned around and went to the house nearest the scene and called 9-1-1. He did not give any statements to the authorities.

Deputy Andrew Lorah of the St. Landy Parish Sheriff's Office arrived on the scene at about 4:54 a.m. He observed the two men, later identified as Mr. Ramer and Mr. Parish, at least a dozen cartridge cases in the road about 150 feet from the car, a plastic baggie on the floorboard containing a white powder, and a pistol stuck between the two front seats.

Detective Mark Fontenot was assigned as the crime scene investigator for the case. He arrived on the scene at 6:13 a.m. Detective Fontenot identified the blue

Dodge Charger in which Mr. Ramer and Mr. Parish's bodies were located as having been rented by Lisa Oakley. He observed no evidence that the vehicle had crashed. Detective Fontenot secured a Ziploc baggie containing "green vegetable matter" from the car. He also located seventeen recently fired 7.62 x 39mm (henceforth simply "7.62") cartridge casings between 138 and 158 feet from the car. Detective Fontenot also located a ZTE flip phone and an iPhone 6 Plus in the car. A discarded job application bearing the name of Noah Briley was also found in the ditch, but its weathered appearance led investigators to conclude that it was not related to the crime.

The driver of the car was identified by his driver's license as Nakia Ramer, Jr. The passenger's driver's license identified him as Shawn Parish.

Detective Fontenot located a "writer's palm" smudge, indicating the outer area of the hand, on the vehicle, which he swabbed for DNA and lifted for a print. Another palm print was found on the car, which he also swabbed and lifted. The window and handle of the passenger rear door were also swabbed, as that door was ajar when the vehicle was found.

At 10:41 a.m., an anonymous caller phoned 9-1-1 and stated that Joseph Reed, Jr., had a gun and was bragging about shooting "Mooney." The same caller phoned again at 10:55 a.m. to ask when police were going to pick Reed up.

On Monday, September 26, Deputy Brandon Dugas was dispatched to 538 Marks Road to assist Deputy Keith Dupre at a disturbance involving a firearm. Deputy Dugas detained three subjects, one of whom was Logan Vidrine. All three were placed in the deputies' squad cars as the others were questioned. Logan was visibly nervous and sweating. Deputy Dugas found some 7.62 casings on the front porch of the house and asked Logan about them. Logan told the deputy that he owned a 7.62 rifle that he had reported as stolen but recently found the rifle under a

2

trailer near his home. The rifle was actually located two houses down in the attic of a house, where Logan had stashed it that morning.

Deputy Dugas retrieved the rifle and noticed what he thought was dried blood on the foregrip. Detective Ronald Papillion photographed the rifle in Deputy Dugas's presence. Logan told Deputy Dugas he hid the rifle because "it might've had a body on it," which is slang indicating it may have been involved in a homicide.

According to Logan, the rifle had been stolen from his house one evening about a month before the murders. David Miller, Defendant, and Tyler Marks, Logan's cousin, came to his home and beat him up. They took the rifle. Logan claimed, despite Deputy Dugas's information to the contrary, that he reported the theft to the police. His claim was confirmed by his mother, Vickie Sandoval.

On the Friday before the murders, Logan claims that Defendant told him that he knew where his rifle was and that for $200, he could get it back. Logan agreed. The next morning, after the murders had occurred, Defendant arrived at Logan's house with the rifle wrapped in a blanket or towel. Defendant was paid $200. Logan later testified that Defendant told him to tell others that Hunter Lanclos, one of Logan's acquaintances, had returned the gun. Logan was also told by Defendant that the rifle might have been used in Lafayette and that he should be careful.

Defendant's warning notwithstanding, Logan almost immediately began posting videos to social media with him holding the rifle, starting around 4:14 a.m. That morning, Logan learned of the murders.

Logan thought his mother was supposed to work that Saturday. At about 6:30 a.m., he woke her up while carrying the rifle slung over his back. As it turned out, that Saturday was her only Saturday off for the month.

3

On Monday, Logan and several friends were smoking and shooting his rifle at a stop sign outside his house. Logan and Desi Bourgeois became embroiled in an argument, and Logan's mother called the sheriff's office.

Deputy Dugas took possession of the rifle, removed the magazine, and cleared the weapon chamber. He then delivered it to Detective Fontenot. Detective Fontenot swabbed the foregrip and front sight with a test kit that returned a positive result for blood. He swabbed them again for DNA, as well as the grip, trigger, and other areas. Detective Fontenot obtained a DNA swab from Deputy Dugas and sent the swab kits to the Acadiana Criminalistics Laboratory. Detective Marcus Bergeron collected a DNA swab from Logan, which was also sent to the crime lab. Several projectiles were recovered from the car and the bodies of Mr. Ramer and Mr. Parish, which were also sent to the crime lab.

Logan was detained and questioned. He claimed at trial that he was not sober during his first questioning but sobered as the day wore on. He admitted lying about finding the rifle under a trailer in the neighborhood. Ultimately, he told the deputies he got it from Defendant. Logan had been robbed a few weeks before the murders as he arrived at a Days Inn hotel to sell some marijuana to an unknown purchaser. He denied that the robbers were Mr. Parish and Mr. Ramer.

When he was questioned again on September 28, Logan turned over his cell phone to the sheriff's office and gave consent for it to be searched. Over 1,000 text messages were retrieved from the phone. A number of text messages from September 24 were exchanged between Logan and Defendant in which Defendant repeatedly denied having sold the rifle back to Logan. These messages were exchanged after Logan began posting videos to social media with the gun.

Stephanie Miller was involved in an intimate relationship with Defendant at the time of the murders. She lived with her mother, Peggy Guidry. Stephanie abused

4

crystal methamphetamine and formaldehyde in 2016; however, on the night of the murders, she had only consumed two half-pints of vodka.

According to Stephanie, Defendant was at her mother's house and took her camouflage gloves and beanie. He left in the "wee hours" and returned two or three hours later. The next morning, Defendant asked Stephanie to bleach her mother's truck. Stephanie thought this request was "stupid," and wiped down the driver's seat and dash before abandoning the task.

Stephanie testified that she had seen Defendant with a rifle she thought was an AK-47, though she was not certain. Defendant told her the gun belonged to Logan Vidrine.

A few weeks before the murders, Stephanie overheard a phone conversation between Defendant and the victims. Defendant was going to "cook some dope" for them. Defendant told her that he held one or both of them responsible for the death of his nephew.

After the murders, Defendant described to Stephanie walking up to the back door of the car, opening it, and shooting the victims. He fired one shot at Mr. Parish and several at Mr. Ramer. Defendant told Stephanie "there was matter on the dashboard - - flesh." Defendant blamed Mr. Ramer for the death of his son or nephew, in memory of whom Defendant had gotten a tattoo. Although Stephanie was interviewed several times by law enforcement, she never related this story to any interviewer until her brother, David Miller, was arrested. Defendant told Stephanie that he should have thrown the rifle into the pond behind Ms. Guidry's house.

Kullyn Briley, one of Stephanie's sons, lived with his mother in his grandmother's house. After the murders, he was told by Defendant that one of the two victims had been shot seventeen times and the other once. The one who had

been shot seventeen times was because of the death of "Dee Dee," Defendant's nephew. The other victim was shot "because he was there."

Brisen Ryder was a friend of Logan. One evening after the murders, he was at the home of his girlfriend, Nikki Dardeau, in Broussard, Louisiana, when Defendant and Stephanie arrived. Brisen claimed that Defendant urged him to call Deputy Dupre and tell him that Logan had shot Mr. Ramer and Mr. Parish. Deputy Dupre drove to Broussard and took Brisen's statement. Brisen later called Deputy Dupre and recanted this statement.

David Miller testified for the State. He asserted that he received a call from Defendant at about 4:10 a.m. on the morning of the murders. Before the call, he and Destiny Jones were asleep in the same bed at Lance Briley's home on Cosay Road. Defendant told him that a car was in the ditch that belonged to one of his friend's fathers. David got up and dressed and grabbed a couple of beers. He then drove his truck to the scene with Destiny. A surveillance camera at the Mohorn Church recorded David's truck passing by at 4:10 a.m. When David saw that the car did not belong to his friend's father, he drove on. David then called Defendant and told him he had misidentified the car. Defendant then asked him whether the occupants were breathing. Defendant asked David to give him a ride to Opelousas to pick up some clothes because he was going on a trip. David picked Defendant up, and they went to a couple of different locations. David dropped Defendant off at Ms. Guidry's house so Defendant could get picked up for his trip to Houston.

In November, Defendant and David were returning from a trip to Texas. Defendant said to David, "[Y]ou knew where I was when I called you that morning." He further stated that he was "by the curb" and that "it was messy."

David was arrested in connection with the murders. His testimony about Defendant discussing the phone call from the scene of the murders was the first time

he told someone about this call. When questioned about that discrepancy, David testified, "Yes. I didn't recall all that." The State granted David use immunity, but he denied that this influenced his testimony. After he was granted immunity, David remembered the conversation.

Lance Briley, who lives on Cosay Road, testified that when he went to bed on September 23, around 10:30 or 11:00 p.m., David and Destiny were at his house. He woke up at 5:00 a.m. to find them gone. He called David, who was at his mother's house picking Defendant up. David, Destiny, and Defendant drove Lance to work. During that drive, none of them said anything about the car in the ditch.

Lance got off work around 10:30 or 11:00 a.m., and that is when he first heard of the murders. He denied knowing either Mr. Ramer or Mr. Parish.

On Sunday, the day after the murders, several people were at Lance's house. At that time, Defendant asked if there were any cameras "down that road."

Destiny Jones also testified under a grant of use immunity from the State. She, too, had been indicted in part because of posts to social media that could be interpreted as self-incriminating. Destiny had previously been in a relationship with Defendant. At the time of the murders, though, she was involved in "back and forth" relationships with David and his nephew, Kullyn Briley. She was eighteen years old and involved in prostitution, drug dealing, and robbery.

On September 23, she was at Lance's house with several people, including David. Around 11:00 p.m., David got a call from Defendant about some white boys with guns at Guidry's house. David left and took Destiny's phone. David returned around 2:20 a.m. Destiny and David ate then eventually went a room "to have sex, lay down, then we got high." They snorted some meth, and Destiny took a "jigga," which was an "x pill." She was not sure if David took "x." Destiny said the drugs she took made her alert, and her memories of the events were clear.

7

Defendant called two times.  David answered the second call, and Defendant told him that he needed to see about his people in the ditch because Defendant thought they wrecked.  Destiny and David went to check.  It was around "four something ish, late 3ish, like around four something."  Destiny had her phone with her, and David had his.  They saw the car, and it was not the right color.  The back door of the car was slightly open, and the interior lights were on.  Destiny testified that David stopped and got out, and returned, saying, , "[O]h fuck no."  He then got back into his vehicle.  He did not let Destiny get out of his truck.

David and Defendant subsequently spoke.  David told Defendant the car did not belong to his friend's father, and Defendant cut him off and said he needed a shower.  Defendant also told David to meet him at Peggy's house.

When they pulled up, Defendant came out in a white outfit.  Defendant asked David, "[W]ere them niggas breathing[?]"  David indicated he did not know.  Then they talked about drugs.  David then went in his own house to get drugs.  Defendant then looked at Destiny and asked, "[W]ere them niggas dead, D[?]"

Thereafter, Lance called David, wondering if David was still giving him a ride to work.  Trevor Briley came out of the house, and Defendant gave him drugs and a "trap phone" or flip phone.  They were going to do a line of meth before Trevor came out.

Defendant, David, and Destiny left, with David driving.  After they picked Lance up, Defendant drove.  Destiny did not think they used the same route going back to Lance's because they did not pass the car again.  It was before 6:00 a.m. when they left to take Lance to work.  Defendant drove Lance to work and did not drive the "easiest route."  Defendant then wanted to go to his mom's house.  While there, they shot dice in the truck and eventually left.  Defendant was dropped at Guidry's house, and Destiny and David went back to Lance's house.

Destiny was questioned by the police. She lied to them about Defendant having possession of the rifle and about the call Defendant made to David on the morning of the murders. Destiny testified that at some point after the murders, she and Defendant were at Peggy's house, and Defendant told her that "he had to get them before they got him." Destiny also claimed that Defendant threatened her more than once over what she said about the murders.

Destiny gave a statement to Deputy Dupre in which she implicated Logan, Keenan Garrett, and Holden Vidrine in the murders, which were in retaliation for the Days Inn robbery.

Defendant was interviewed by the police on three occasions. In the first, Defendant denied having been in the area of the murders that morning. He also denied Logan's account of retrieving his rifle from Defendant.

In the second interview, taken four days after the first, he again denied returning the rifle to Logan. He denied being in the area that day. He admitted knowing Mr. Parish and Mr. Ramer, whom he called friends, although he characterized them as robbers and murderers. Defendant pointed at a tattoo on his arm and said he found out the day before that Ramer killed "him."[1] Defendant further stated that Mr. Ramer and Mr. Parish had weed they had just murdered someone for in New Orleans. A week before they died, they offered to sell him several pounds of weed. Defendant said he declined the offer because he cooked dope.

He admitted calling Mr. Parish at about 3:00 a.m. to wish him a happy birthday. Mr. Parish called him back to ask for some dope, but Defendant told him he did not have any and would not get any because he was traveling to Houston.

---

[1] Several witnesses, including the artist, testified that shortly before the murders, Defendant had himself tattooed with angel's wings in honor of his nephew, "Dee Dee," who had recently been killed.

Defendant was interviewed a third time in November 2016. He was questioned about a Springfield Armory 9mm pistol found in Stephanie's purse. He admitted that this pistol was taken from Logan and tossed under the house while Logan was not looking. At that point, Defendant was informed that he was being charged with possession of a firearm by a convicted felon.

Dr. Yen Van Vo testified as an expert in forensic pathology. He determined that Mr. Parish had been shot nine times from behind. Any of five shots of the nine would have been fatal. Mr. Ramer was shot fourteen times, at least nine from behind. Dr. Vo could not determine the range from which the shots were fired.

Carolyn Booker of the Acadiana Crime Lab was accepted as an expert in serology and DNA analysis. The swabs taken from the rifle were not blood. Swabs taken from the rifle, magazine and unspent cartridges, spent cartridge cases, and the exterior of the victims' car were inconclusive for DNA matches from anyone from whom a sample had been obtained, including Defendant.

Phillip Stout was accepted as an expert in forensic science with a specialty in firearms examination. In 2016, he was employed at the Acadiana Crime Lab. Stout testified that nineteen cartridge cases submitted by police were examined, and it was determined that they had been cycled through the action of the weapon," the rifle taken from Logan. He could not determine if they had been fired by the weapon. However, projectiles from Mr. Ramer's body and from the driver's seat were fired from that rifle. Stout also determined that a jacketed bullet he examined was *fired* from that gun. One bullet jacket fragment he studied exhibited the same type rifling, but there were insufficient individual markings to say it was fired from the rifle.

Shane Garrard, an employee of the St. Landry Parish Sheriff's Office, was accepted as an expert in call detail and mapping analysis. Garrard gave a list of phone numbers associated with several people involved in this case: Verizon–Logan

10

Vidrine 337-336-3214; AT&T–Shawn Parish 337-418-6702 and 337-945-5778; Defendant 337-308-6080 and 337-692-0771; David Miller 337-351-8163; Destiny Jones 337-418-6888; and Keenan Garrett 337-678-8314. Garrard testified regarding cell towers used during the pertinent time period by the phone numbers provided.

He explained that cell towers are divided into three sectors, splitting a circle into three parts. By using the sectors, the "direction that the device that was using that tower was located." The State asked Garrard if he recognized maps he made at its request and published those maps to the jury.

According to Garrard, Logan's activations at 4:42 and 4:45 were indicative that he was between two towers "in the little balloon where that house is." Logan's device did not move "outside of that little area at all on this map." Logan did not cross the "plane of that east tower and go east of that." By contrast, both Defendant's phone and Mr. Parish's phone activated to the east of the tower and activated on the same tower during the time frame of the murder. As for David's device, no data was returned from 3:00 to 5:00.

There were 174 contacts between Logan and Defendant on Logan's phone that were not found on Defendant's. Garrard indicated the information had been deleted or Defendant used a different phone. Additionally, communications between Destiny and Defendant had been deleted. Indeed, all communications from September 24 were absent from Defendant's phone.

Garrard gathered information for a phone number associated with Garrett. That device did not leave the Opelousas area from 11:00 p.m. through 6:00 a.m., and the phone was not deactivated for any length of time.

Garrard testified about Mr. Parish's phone records. The State asked, "[T]hat's going to be 3:43 in the morning. . . . So, 4:43 in the morning is that a reception?"

11

Garrard indicated it was "probably" an answered call. Garrard was further questioned:

> Q. So, this is going to be 3:43 in the morning last call answered ten seconds . . . . The one right before that that . . . coming in from 6080 [Defendant's phone] again, that's at 3:37 in the morning. How long did that call last?
>
> A. One minute nineteen seconds.
>
> Q. So, that was definitely a received call.
>
> A. Yes.

Defendant called Mr. Parish at 3:04 and 3:20 a.m., and Mr. Parish called Defendant at 3:25, 3:27, 3:34, and 3:35 a.m. Defendant texted Mr. Parish on September 24, 2016, at 8:55 a.m.: "See how y'all played me. Had me wait for nothing. I told you the B daddy was tripping. I had to walk and get in my car. Don't ask for a ride and I still love you. Call me when you get up." Mr. Parish was dead at that time, as the 9-1-1 call was placed at 4:39.

David received a text on September 27, 2016, at 2:48 p.m. that was deleted: "Logan is going to - - Bobby Guidroz - -. She's going to tell him she know [sic] about the murder scene and show the videos about Logan to him, and I figured Lance and Rachel will show him - - from out of nowhere, who is - - Bobby - - already show him the same thing. It will be under control." This text originated from Defendant. Other content was either deleted from David's phone or put in the trash bin. This included David texting back and forth with Defendant between 8:17 and 8:20 a.m.

However, Defendant's messages were present for September 25. Garrard had no knowledge of when any information was deleted from phones.

Garrard was asked if the telephone number associated with Defendant was operating in the general vicinity of the crime scene at a suspicious time. Garrard

12

replied: "We never say that. The telephone number associated with 6880 was operating on those towers that does service the scene of the crime."

On cross-examination, Garrard was asked about NELOS (Network Event Location Services) data provided by AT&T, which stated, "The results provided are AT&T's best estimate of the location of the target number. Please exercise caution in using these records for investigative purposes, as location data is sourced from various databases, which may cause location results to be less than exact." Each data entry provided a statement regarding location accuracy, for example, "[L]ocation accuracy likely better than 5,000 meters." This was the equivalent of three miles. Other entries were accurate within six miles. However, when creating the maps, Garrard filtered out data less likely than 500 meters.

Crystal Leblanc was employed by the Opelousas Police Department from 2013 to 2016. She investigated the death of Donnie Sam, who may have been known as Dee Dee. However, she never heard anyone call him that. Traylon Batiste was convicted in relation to his death, and there were no other suspects. Jaylon Levier, Keenan Garrett's little brother, died in August 2013. It was determined that Mr. Parish was responsible for Levier's death, but the charge against him was dismissed because the death was deemed accidental.

Deputy Dupre was called by Defendant. He testified about a statement he obtained from Destiny that implicated Logan, Keenan Garrett, and Holden Vidrine.

After the close of evidence and summations, the jury retired and returned a unanimous verdict finding Defendant guilty of the two murders. Defendant now appeals, and asserts that the following were errors:

I.    The evidence adduced at trial was not sufficient to prove beyond a reasonable doubt Mr. McLendon was culpable in the murders of Nakia Ramer, Jr., and Shawn Parish. There were no eyewitnesses to the killings; the gun used to commit the offense did not belong to Mr. McLendon; and, the evidence of his

involvement was in the form of witnesses whose credibility was, to say the least, suspect.

II. The trial court erred in allowing the State to introduce evidence of other crimes or acts, which did nothing more than paint Mr. McLendon in a bad light and which had little to no probative value.

III. The trial court erred in imposing consecutive sentences, particularly in light of the failure to provide any basis for the consecutive, as opposed to concurrent, sentences in a case where the offenses arose out of one course of action or transaction.

## ANALYSIS

*Errors Patent*:

Under La.Code Crim.P. art. 920, we are mandated to review all matters for errors patent on the face of the record. Louisiana Code of Criminal Procedure Article 930.8 provides that no applications for post-conviction relief, including applications for out-of-time appeals, may be considered if filed more than two years after the judgment of conviction and finality of sentence. Trial courts are required to advise defendants of this provision at the time of sentencing. La.Code Crim.P. art. 930.8(C). That did not occur at Defendant's sentencing; therefore the trial court is directed to inform the Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of the opinion and to file written proof in the record that the Defendant received the notice.

*Assignment of Error Number One*:

Defendant argues that the evidence is insufficient to support his conviction.

[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

14

*Jackson v. Virginia*, 443 U.S. 307, 318, 99 S. Ct. 2781, 2788–89 (1979)(emphasis in original).

Defendant notes that the evidence turned on the testimony of witnesses who admitted lying and drug use. Most of the witnesses were related to or in relationships with other witnesses or interested parties. There were no eyewitnesses, there was no DNA linking Defendant to the crimes, phone records never pinpointed him at a location on Cosay Road, and no one admitted being involved with or at the scene with Defendant.

The credibility of almost every lay witness was at issue in this case. There was testimony, however, that the jury could rely on to connect Defendant to the offenses. Defendant made several incriminating statements. Defendant admitted the killings to Stephanie, there was matter on the dashboard, and that he walked up to the car and opened the back door. Defendant also told Stephanie to bleach her mother's truck. David testified that Defendant called him about the car, and later that night, Defendant asked David if the victims were breathing. At a later date, Defendant told David he was by the "curb" when he called David at 4:00 a.m., and it was messy. The crime was committed in an "S curve" on Cosay Road.

Destiny confirmed David's testimony regarding Defendant asking whether the victims were breathing. Destiny further testified that Defendant asked her if the car's occupants were dead. Additionally, Defendant told Destiny he had to get the victims before they got him. Kullyn testified Defendant said one of the victims was shot so many times because of Dee Dee, and Trevor said Defendant told him he did it because they killed his nephew.

Several witnesses connected Defendant to the murder weapon and confirmed that it had been taken from Logan. Then, shortly after the murders, Defendant

15

returned the rifle to Logan, who almost immediately began posting images to social media posing with the rifle.

The jury heard all of the evidence presented and made credibility determinations in this case. "It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review." *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Viewing the evidence in the light most favorable to the State, we cannot say the evidence did not sufficiently establish Defendant's guilt.

*Assignment of Error Number Two*:

Defendant contends that the trial court erred in allowing the State to introduce evidence of other crimes or acts which did nothing more than paint him in a bad light and had little to no probative value.

At the time of trial, La.Code Evid. art. 404(B) provided:

> **Other crimes, wrongs, or acts**. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

The State filed a notice of intent to introduce evidence of other acts/crimes on January 6, 2023, seeking to introduce evidence that Logan Vidrine was beaten and of Defendant's involvement in the drug trade. The evidence was to be presented through statements Defendant made to law enforcement and the testimony of Stephanie, Peggy Guidry, Logan, Colby Soileau, Destiny, and David. A hearing on

16

the motion was held on January 13, 2023. The court found the State's notice was timely and adequately provided the defense with notice of its intent to introduce other acts/crimes evidence.[2]

On January 13, 2023, Defendant filed a "Motion and Incorporated Memorandum to Exclude Evidence or Other Crimes, Wrongs, or Acts," addressing the beating of Logan and Defendant's involvement with drugs. He asked the court to instruct witnesses, including law enforcement, Stephanie, Peggy Guidry, Logan, Colby Soileau, Destiny, and David, not to refer to this evidence during their testimony. On January 19, 2023, the State filed a "Memorandum in Response to Defendant's Objection to State's Motion Regarding 404(B) Evidence and Notice.

Minutes of court for January 23, 2023, state:

The Court, on Friday, January 13, 2023 the Court heard the following: (1) State's Motion to Introduce Other Acts/Crimes Evidence Admissible Under LA Code of Evidence Article 404(B) and Request for Notice of Hearing; (2) State's Motion to Determine Free and Voluntary Nature of Defendant's Statements. The Court rules as follows, In reference to Motion (1), the Court finds that the as to the Defendant's interviews, the statements present therein were free and voluntary under the Code of Criminal Procedure. The Court will determine admissibility when the appropriate time presents itself.

. . . .

The Defense filed a Reverse 404B Notice and/or Motion in Limine. The motion was taken up and argued. There was no ruling required by the Court at this time.

---

[2]Defendant filed a writ application with this court seeking review of the trial court's ruling that the State's notice of intent was adequate and arguing that the trial court erred in failing to determine the admissibility of evidence before trial. This court found the trial court's ruling on the State's notice was correct. As to a hearing, this court found that Defendant did not clearly request a hearing. Nevertheless, information provided to the court indicated Defendant filed a Motion to Exclude Evidence of Other Crimes requesting a ruling on the admissibility of the other crimes evidence at issue, and the hearing was set for Monday, January 23, 2023, rendering the claim premature. *State v. McLendon*, 23-33 (La.App. 3 Cir. 1/20/23) (unpublished opinion).

The January 24, 2023 minutes of court provide, in part, "Out of the presence of the jury, a discussion was held regarding 404 Other Crimes Evidence. There was no ruling required by the Court."

On January 27, 2023, the State sought to introduce evidence that Defendant called Destiny a "ratting ass bitch." During argument on the admissibility of this evidence, defense counsel stated, "But most important, and I'll say this, Judge, if she wants to say that he called her a rat bitch, I think that would be fine, but to show a video of their interaction . . . crosses over from more prejudicial than probative all things considered." The trial court also addressed La.Code Evid. art. 404(B) and stated, "I will allow the introduction of the jail video[.]" Thereafter, defense counsel suggested that the court address other anticipated issues relating to La.Code Evid. art. 404(B). The court stated it had previously ruled on the free and voluntary nature of Defendant's statements to investigating officers. The trial court then concluded it had ruled on Defendant's "motion to exclude."

Defendant subsequently addressed statements about the battery of Logan. The court found it was up to the jury to decide if the allegations were true, and the entirety of Defendant's statements were admissible. Defendant next addressed allegations that he cooked dope, and the court denied Defendant's motion.

Minutes from January 27, 2023, provide, "The Court will allow introduction of video with the witness's testimony. The Court ruled that 404B evidence will be admissible (from previous hearing on February 13, 2023 [sic]). The Court further ruled that the defense's previously filed 404B motion is DENIED."

In brief to this court, Defendant addresses the admissibility of evidence that he cooked dope. He alleges the State failed to provide evidence to suggest the offenses involved a drug deal inasmuch as the victims had a small amount of marijuana and some cash on them when they were found, and there was no testimony

18

that the murders occurred as the result of a drug deal gone bad. Defendant points out Stephanie Miller's testimony that he was cooking dope for the victims and the trial court's refusal to require redaction of his statements to remove references to cooking dope. Defendant suggests there was no evidence to support Stephanie's statements or that Defendant ever sold drugs to the victims or engaged in a drug deal with the victims on September 24, 2016.

Defendant also addressed testimony that Logan was beaten. He suggests that event had no bearing on the case, inasmuch as Logan was not a victim, Logan did not testify that the rifle was taken when he was beaten, and there was no testimony the decedents were involved in the incident. Additionally, the incident did not prove motive, opportunity, or intent. Thus, testimony regarding the beating was prejudicial to Defendant.

Defendant further complains about the admissibility of Destiny's testimony that Defendant called her a "ratting ass bitch." Defendant alleges his actions did not support the offense of intimidation of or impeding a witness, as set out in La.R.S. 14:129.1(A)(1).[3]

Defendant's brief does not comply with Uniform Rules—Courts of Appeal, Rule 2–12.4. Uniform Rules—Courts of Appeal, Rule 2–12.4 states:

> A. The brief of the appellant shall contain, under appropriate headings and in the order indicated:
>
> . . . .
>
> (3) a jurisdictional statement setting forth the constitutional and statutory basis for the court to exercise appellate jurisdiction, with

---

[3]Louisiana Revised Statutes 14:129.1 provides, in pertinent part:

A. No person shall intentionally:

(1) Intimidate or impede, by threat of force or force, or attempt to intimidate or impede, by threat of force or force, a witness or a member of his immediate family with intent to influence his testimony, his reporting of criminal conduct, or his appearance at a judicial proceeding[.]

19

citations to applicable provisions. The jurisdictional statement shall also include the dates of the judgment appealed and of the motion and order for appeal to establish the timeliness of the appeal and the following, as applicable:

. . . .

(9) the argument, which shall contain:

(a) appellant's contentions, with reference to the specific page numbers of the record and citations to the authorities on which the appellant relies;

(b) for each assignment of error and issue for review, a concise statement of the applicable standard of review, which may appear in the discussion or under a separate heading placed before the discussion; and

(c) for each assignment of error and issue for review which required an objection or proffer to preserve, a statement that the objection or proffer was made, with reference to the specific page numbers of the record; and

. . . .

B. (1) A copy of the judgment, order, or ruling complained of, and a copy of either the trial court's written reasons for judgment, transcribed oral reasons for judgment, or minute entry of the reasons, if given, shall be appended to the brief of the appellant. If reasons for judgment were not given, the brief shall so declare.

. . . .

(3) The court may not consider the argument on an assignment of error or issue for review if suitable reference to the specific page numbers of the record is not made.

(4) All assignments of error and issues for review shall be briefed. The court may deem as abandoned any assignment of error or issue for review which has not been briefed.

In support of his argument, Defendant cites record page 868, which contained Stephanie's testimony that Defendant cooked dope for the victims. He also cites pages 1296 and 1297 from January 27, 2023. Pages 1296 and 1297 contain a portion of defense counsel's argument regarding the admissibility of evidence that Defendant cooked dope and the trial court's statement that the defense's motion was

20

denied. Defendant does address what occurred during proceedings held on January 13, January 23, and January 24. Defendant made three statements to police, and he fails to identify which of the three statements contains remarks regarding cooking dope and the specific wording of the objectional statements. Moreover, there was no indication the trial court made any ruling regarding the admissibility of testimony about Defendant's involvement in cooking dope prior to January 27. However, Stephanie testified on January 24, and defense counsel did not move for a ruling on the admissibility of her testimony at that time, and Defendant does not point to any objection to her testimony. Furthermore, the discussion had on January 27 did not reference Stephanie's testimony. Defendant's arguments regarding references to him cooking dope appear more like a complaint as to the sufficiency of the evidence and not a La.Code Evid. art. 404(B) analysis.

Defendant also fails to address the proceedings held on January 13, January 23, and January 24 in his attack on the admissibility of testimony about beating Logan. In that discussion Defendant merely cites record page 1105, which is testimony by Logan as to the date he bought two guns and when the AK-47 was stolen. The witnesses who testified about the beating included Brisen, Logan, David, and Destiny. Brisen testified on January 25, and Logan and David testified on January 26. Defendant points to no ruling regarding the admissibility of testimony about the beating made prior to January 27, and Defendant does not point to any objection to the witnesses' testimony. Furthermore, the discussion had on January 27 merely referenced the testimony of Logan. Thus, Defendant's brief fails to comply with Uniform Rules—Courts of Appeal, Rule 2–12.4.

When the parties addressed the admissibility of Destiny's testimony, they discussed the elements of La.R.S. 14: 129.1(A)(1). However, the trial court's ruling was limited to the video of Defendant's exchange with Destiny. Defendant does not

21

address the content of the video in brief to this court or argue the video was inadmissible. Because, as defense counsel said, "[I]f she wants to say that he called me a rat ass bitch, I think that would be fine," and Defendant does not point to an objection made during Destiny's testimony, the issue before the court was not preserved for review. La.Code Crim.P. art. 841.

For these reasons, Defendant's second assignment of error lacks merit.

*Assignment of Error Number Three*:

In his third assignment of error, Defendant contends the trial court erred in imposing consecutive sentences, particularly in light of the failure to provide any basis for the consecutive sentences in a case where the offenses arose out of one course of action or transaction. Defendant suggests the trial court made no findings and stated no reasons for imposition of consecutive sentences. Additionally, the sentences imposed do not further the ends of justice. Thus, the trial court should have ordered the sentences to be served concurrently.

The penalty for second degree murder is a mandatory term of life imprisonment without benefit of parole, probation, or suspension of sentence. La.R.S. 14:30.1. Defendant did not move for a downward departure pursuant to *State v. Dorthey*, 623 So.2d 1276 (La.1993). Thus, the only discretion the trial judge could exercise was whether to order the sentences for the two murders to run concurrently or consecutively. Louisiana Code of Criminal Procedure Article 883 provides, "If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively." The failure of the trial court to articulate the reasoning behind imposing consecutive sentences does not require that the matter be

remanded if the record adequately supports consecutive sentences. *State v. McKeel*, 13-855 (La.App. 3 Cir. 2/12/14), 153 So.3d 1029.

Defendant did not object to the consecutive nature of the sentences when they were imposed and did not file a motion to reconsider his sentence. In similar instances, this court has held that review of the sentences is precluded; however, in the interest of justice, this court has reviewed sentences for constitutional excessiveness, including the consecutive nature of the sentences imposed. *State v. Pardue*, 22-565 (La.App. 3 Cir. 3/15/22), 359 So.3d 158; *State v. Wood*, 08-1511 (La.App. 3 Cir. 6/3/09), 11 So.3d 701. Defendant's criminal history, the dangerousness and viciousness of the crimes, the harm to the victims, whether the defendant poses an unusual risk of harm to the public, the defendant's potential for rehabilitation, and whether the defendant benefited from a plea agreement are relevant to whether imposing consecutive sentences is appropriate. S*tate v. Henson*, 19-881 (La.App. 3 Cir. 6/3/20), 298 So.3d 844, *writ denied*, 20-785 (La. 11/18/20), 304 So.3d 422.

The majority of shots from the rifle hit the victims in the back, indicating an ambush-style attack. Each of the victims was hit by several rounds: Mr. Ramer was hit fourteen times and Mr. Parish nine. The killings were brutal. Further, it appears the killings were in retaliation for the earlier killing of Donnie Sam, for whose murder Traylon Batiste was convicted. Given the circumstances of the murders, we cannot say the trial court erred in imposing consecutive sentences.

In *State v. Dunbar*, 94-1492, p. 10 (La.App. 3 Cir. 5/31/95), 657 So.2d 429, 434 (alteration in original), this court addressed the defendant's claim that the trial court erred in imposing consecutive sentences as punishment for offenses which arose out of the same course of conduct:

Even if the trial judge committed error in imposing consecutive sentences, the error was harmless. For defendant's aggravated rape conviction, the trial judge sentenced the defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. In *State v. Mosley*, 466 So.2d 733 (La.App. 4 Cir.), *writ denied*, 468 So.2d 1202 (La.1985), the fourth circuit, with whom we agree, found remand unnecessary in a life-imprisonment case where the imposition of consecutive sentences was improper. The court in *Mosley* sentenced the defendant to consecutive sentences of ninety-nine (99) years each on three counts of armed robbery, a total of 297 years, to be served without benefits. The fourth circuit stated, "Whether [the defendant's] sentence is 99 years or 297 years he will be in jail for the rest of his life unless he is pardoned. Remanding for resentencing under these circumstances is an academic exercise which has no practical benefit to anyone." *Mosley*, 466 So.2d at 736, *see also State v. Franklin*, 519 So.2d 292, 295 (La.App. 5 Cir.1988). In *State v. Dennard*, 482 So.2d 1067, 1068 (La.App. 3 Cir.1986), this court stated in dicta that since the defendant "has but one life to serve, it is difficult to see that a consecutive sentence would penalize him excessively." Thus, even if the trial court erred in imposing a consecutive sentence in the present case, the error was harmless.

Based on *Dunbar* and the factors indicating that consecutive sentences are appropriate, this assignment of error lacks merit.

## DECREE

The trial court is ordered to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice. Defendant's convictions and sentences are affirmed.

**CONVICTIONS AND SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS.**